# Exhibit A

**ASSET PURCHASE AGREEMENT**

between

**NOVA SERVICES, INC.,**

**RECLEIM LLC**

and

**RECLEIM NOVA, LLC**

dated as of

May 5, 2017

# TABLE OF CONTENTS

ARTICLE I        Defined Terms ................................................................... 1

    Section 1.01        Defined Terms ........................................... 1

    Section 1.02        Construction .............................................. 5

ARTICLE II        Purchase and Sale ..................................................... 5

    Section 2.01        Purchase and Sale of Assets ................... 6

    Section 2.02        Excluded Assets. ...................................... 6

    Section 2.03        Assumption of Liabilities ......................... 7

    Section 2.04        Specifically Excluded Liabilities ............. 7

ARTICLE III        Purchase Price; Closing ........................................... 8

    Section 3.01        Purchase Price ........................................... 8

    Section 3.02        Payment of Purchase Price ....................... 8

    Section 3.03        Closing ....................................................... 8

    Section 3.04        Closing Deliverables ................................. 8

    Section 3.05        Payment of Deferred Purchase Price ....... 9

    Section 3.06        Allocation of Purchase Price ................. 12

    Section 3.07        Method of Payment ................................. 12

    Section 3.08        Withholding Tax ...................................... 12

ARTICLE IV        Representations and Warranties of Seller ........................ 12

    Section 4.01        Organization and Authority of Seller; Enforceability ............ 12

    Section 4.02        No Conflicts; Consents ........................... 12

    Section 4.03        Title to and Sufficiency of Purchased Assets ....................... 13

    Section 4.04        Financial Statements ............................... 13

    Section 4.05        Operations since Interim Balance Sheet Date ....................... 13

    Section 4.06        Condition of Assets ................................ 13

    Section 4.07        Inventory .................................................. 13

    Section 4.08        Intellectual Property ................................ 14

    Section 4.09        Assigned Contracts ................................. 14

    Section 4.10        Permits ...................................................... 14

    Section 4.11        Environmental Matters ............................ 14

    Section 4.12        Non-foreign Status .................................. 15

    Section 4.13        Compliance With Laws ........................... 15

    Section 4.14        Legal Proceedings .................................. 15

    Section 4.15        Real Property ........................................... 15

Section 4.16  Employees and Employment Matters ..................................... 15

Section 4.17  Brokers ................................................................... 16

Section 4.18  Full Disclosure ......................................................... 16

ARTICLE V  Representations and Warranties of Buyer ........................................... 16

Section 5.01  Organization and Authority of Buyer; Enforceability .......... 17

Section 5.02  No Conflicts; Consents ................................................. 17

Section 5.03  Financial Statements ................................................... 17

Section 5.04  Legal Proceedings ...................................................... 17

Section 5.05  Brokers ................................................................... 17

ARTICLE VI  Covenants ......................................................................... 17

Section 6.01  Public Announcements ................................................... 17

Section 6.02  Employee Matters ........................................................ 17

Section 6.03  Covenant Not to Compete and Confidentiality ..................... 18

Section 6.04  Bulk Sales Laws ......................................................... 18

Section 6.05  Transfer Taxes .......................................................... 18

Section 6.06  Further Assurances ...................................................... 19

Section 6.07  Consents ................................................................. 19

Section 6.08  Non-Consenting Creditors .............................................. 19

ARTICLE VII  Indemnification ................................................................. 20

Section 7.01  Survival ................................................................. 20

Section 7.02  Indemnification By Seller ............................................. 20

Section 7.03  Indemnification By Buyer .............................................. 20

Section 7.04  Indemnification Procedures ............................................ 20

Section 7.05  Tax Treatment of Indemnification Payments ....................... 21

Section 7.06  Effect of Investigation ............................................... 21

Section 7.07  Cumulative Remedies ................................................... 21

ARTICLE VIII  Miscellaneous ................................................................. 21

Section 8.01  Expenses ................................................................. 21

Section 8.02  Notices .................................................................. 21

Section 8.03  Headings ................................................................. 22

Section 8.04  Severability ............................................................ 22

Section 8.05  Entire Agreement ....................................................... 22

Section 8.06  Successors and Assigns ................................................ 22

Section 8.07 No Third-party Beneficiaries ................................................... 23

Section 8.08 Amendment and Modification ............................................. 23

Section 8.09 Waiver.................................................................................... 23

Section 8.10 Governing Law ..................................................................... 23

Section 8.11 Submission to Jurisdiction .................................................... 23

Section 8.12 Waiver of Jury Trial.............................................................. 23

Section 8.13 Specific Performance ........................................................... 23

Section 8.14 Counterparts.......................................................................... 23

**Exhibits**

Exhibit 1.01(a) Seller Retained Account Information

Exhibit 1.01(b) Class C Interests

Exhibit 2.02(e) Excluded Assets

Exhibit 2.03(b)(ii) Reserved Liabilities Not Being Assumed

Exhibit 2.03(b)(iii) Assumed Liabilities

Exhibit 3.01(b) Indebtedness to be Paid Off at the Closing

Exhibit 3.06 Purchase Price Allocation

Exhibit 5.03 Pro-Forma Income Statement

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of May 5, 2017, is entered into among Nova Services Inc., a Maryland corporation ("**Seller**"), Recleim LLC, a Delaware limited liability company ("**Parent**"), and Recleim Nova, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller is engaged in the business of haul-away appliance recycling and bulk appliance and appliance part sales (the "**Business**");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities, subject to the terms and conditions set forth herein; and

WHEREAS, concurrently with the execution of this Agreement, Buyer has entered into an employment agreement with Guy Naylor (the "**Key Employee Agreement**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINED TERMS

**Section 1.01    Defined Terms.**  As used herein, the following terms have the meanings set forth below:

"**Action**" has the meaning set forth in Section 4.14.

"**Adjusted EBITDA**" means, with respect to any Calculation Period, the net income before interest, income taxes, depreciation and amortization of the Buyer Business for such period, determined in accordance with GAAP but applied and calculated in a manner consistent with the EBITDA calculation derived from the audited financial statements of the Buyer Business for the most recent fiscal year end.

"**Affiliate**" means, with respect to any Person, any other Person which, at the time of determination, directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with such Person.  For purposes of this Agreement, "control", "controlled by", "under common control with" and "controlling" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Aggregate Payoff Amount**" has the meaning set forth in Section 3.01(b).

"**Agreement**" has the meaning set forth in the preamble.

"**Assigned Contracts**" has the meaning set forth in Section 4.09.

"**Assigned Leases**" has the meaning set forth in <u>Section 4.15</u>.

"**Assignment and Assumption of Lease**" has the meaning set forth in <u>Section 3.04(a)(ii)</u>.

"**Assumed Liabilities**" has the meaning set forth in <u>Section 2.03(b)</u>.

"**Bill of Sale and Assumption Agreement**" has the meaning set forth in <u>Section 3.04(a)(i)</u>.

"**Business**" has the meaning set forth in the recitals.

"**Business Employee**" means an employee of Seller.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Business**" means the Business, as conducted by Buyer following the Closing.

"**Calculation Periods**" means (a) the period beginning on the Closing Date and ending on December 31, 2017 and (b) each of the calendar years ending thereafter, until such time when the Deferred Purchase Price is paid in full.

"**Class C Interests**" means the securities of Parent with the characteristics set forth on <u>Exhibit 1.01(b)</u>.

"**Closing**" has the meaning set forth in <u>Section 3.03</u>.

"**Closing Date**" has the meaning set forth in <u>Section 3.03</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder.

"**Competing Business**" has the meaning set forth in <u>Section 6.03(a)</u>.

"**Confidential Information**" means any data or information concerning Seller (including trade secrets), without regard to form, regarding (for example and including) (i) business process models, (ii) proprietary software, (iii) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, contracts, suppliers, customers, and customer lists, (iv) the identity, skills and compensation of employees, contractors, and consultants, (v) specialized training or (vi) discoveries, developments, trade secrets, processes, formulas, data, lists, and all other works of authorship, mask works, ideas, concepts, know-how, designs, and techniques, whether or not any of the foregoing is or are patentable, copyrightable, or registrable under any Intellectual Property laws in the United States or elsewhere.  Notwithstanding the foregoing, no data or information constitutes "Confidential Information" if such data or information is publicly known and in the public domain through means that do not involve a breach by Seller of any covenant or obligation set forth in this Agreement.

"**Deferred Purchase Price**" means $3,750,000.

"**Deferred Purchase Price Calculation**" has the meaning set forth in <u>Section 3.05(b)(i)</u>.

"**Deferred Purchase Price Calculation Delivery Date**" has the meaning set forth in Section 3.05(b)(i).

"**Deferred Purchase Price Calculation Objection Notice**" has the meaning set forth in Section 3.05(b)(ii).

"**Deferred Purchase Price Calculation Statement**" has the meaning set forth in Section 3.05(b)(i).

"**Deferred Purchase Price Payment**" has the meaning set forth in Section 3.05(a).

"**Disclosure Schedules**" has the meaning set forth in Article IV.

"**Encumbrance**" means any mortgage, pledge, lien, charge, security interest, claim or other encumbrance.

"**Environmental Law**" means all laws concerning the environment, human health and safety or Hazardous Substances.

"**Environmental Permits**" means any permits, licenses or authorizations required by or pursuant to any Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Liabilities**" has the meaning set forth in Section 2.03(a).

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" means any (i) government or any governmental, regulatory or administrative body thereof, or political subdivision thereof, whether federal, state, provincial, municipal, local or foreign, (ii) governmental agency, instrumentality, commission, department, board, bureau or any authority thereof, (iii) multinational or supra national entity, body or authority, or (iv) court or tribunal.

"**Hazardous Substances**" means (i) any petroleum, petroleum by-product or break-down product, radiation or radioactive material, asbestos or asbestos-containing material, mold and polychlorinated biphenyl, and (ii) any material, substance, mixture or solution that is defined, identified or regulated as a pollutant, contaminant or waste, or as hazardous, toxic, radioactive or words of similar effect, by or pursuant to any Environmental Law.

"**Indemnified Party**" has the meaning set forth in Section 7.04.

"**Indemnifying Party**" has the meaning set forth in Section 7.04.

"**Independent Accountant**" has the meaning set forth in Section 3.05(b)(ii).

"**Initial Purchase Price**" has the meaning set forth in Section 3.01(a).

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (i) trademarks and service marks, including all applications and

registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) websites and internet domain name registrations; and (vi) other intellectual property and related proprietary rights, interests and protections (including all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing).

"**Interim Balance Sheet**" means the balance sheet of Seller as of the Interim Balance Sheet Date.

"**Interim Balance Sheet Date**" means March 31, 2017.

"**Key Employee Agreement**" has the meaning set forth in the recitals.

"**Non-Assignable Contract**" means any Contract included in the Purchased Assets that requires the consent of any third party, which consent has not been obtained by Seller prior to or as of the Closing.

"**Parent**" has the meaning set forth in the preamble.

"**Parent Interests**" means the limited liability company membership interests of Parent.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, or Governmental Authority.

"**Prior Loan**" has the meaning set forth in Section 3.05(f).

"**Purchase Price**" has the meaning set forth in Section 3.01.

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Purchased IP**" has the meaning set forth in Section 4.08(a).

"**Review Period**" has the meaning set forth in Section 3.05(b).

"**Restricted Period**" has the meaning set forth in Section 6.03(a).

"**Seller**" has the meaning set forth in the preamble.

"**Seller Retained Account**" means that certain bank account set forth on Exhibit 1.01(a), which shall be an Excluded Asset and to which Buyer will send the Initial Purchase Price and Deferred Purchase Price in accordance with this Agreement (unless otherwise requested by Seller in writing pursuant to Section 3.07).

"**Seller Plans**" means (i) all employee benefit plans (within the meaning of Section 3(3) of ERISA) and all retirement, welfare benefit, bonus, stock option, stock purchase, restricted stock, incentive, equity or equity-based compensation, deferred compensation, retiree health or life insurance, supplemental retirement, severance, change in control, Code Section 125 flexible benefit, vacation or other benefit plans, programs or arrangements, whether written or oral, that are maintained, contributed to or sponsored by Seller or its respective Affiliates for the benefit of

any current or former employee, director or individual consultant of the Business, other than governmental plans or arrangements, and (ii) all individual employment, retention, termination, severance, Tax gross up, collective bargaining, consulting, employee non-competition, employee non-solicitation or other similar contracts pursuant to which Seller or its respective Affiliates currently has any obligation with respect to any current or former employee, director or individual consultant of the Business.

"**Transferred Permits**" has the meaning set forth in <u>Section 4.10</u>.

**Section 1.02    Construction**.

(a)     Unless the context of this Agreement otherwise requires, (i) words of any gender include the other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereunder," "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto; (iv) the terms "Article," "Section," "paragraph," "clause" and "Exhibit" refer to the specified Article, Section, paragraph, clause or Exhibit of this Agreement; and (v) the words "include" and "including" and variations thereof mean without limitation.

(b)     References to agreements and other documents (including this Agreement) include (i) all subsequent amendments and other modifications thereto and (ii) all addenda, exhibits and schedules thereto.

(c)     References to statutes include all regulations promulgated thereunder and references to statutes or regulations will be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(d)     Whenever this Agreement refers to a number of days, such number refers to calendar days unless Business Days are specified.

(e)     All accounting terms used herein and not expressly defined herein have the meanings given to them under GAAP.

(f)     References to "$" or "dollars" means United States dollars.

(g)     A reference to any Person includes such Person's successors and permitted assigns.

(h)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and if the last day of such period is not a Business Day, the period will end on the next succeeding Business Day.

(i)     This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party will not apply to any construction or interpretation hereof.

## ARTICLE II
### PURCHASE AND SALE

**Section 2.01     Purchase and Sale of Assets.**  Subject to the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest to all assets, properties, rights and interests, of any kind and description (whether real or personal, tangible or intangible, fixed, contingent or otherwise), wherever located and by whomever possessed, in any way related to, or used in, the Business, other than the Excluded Assets (collectively, the "**Purchased Assets**"), free and clear of any Encumbrance. The Purchased Assets include Seller's right, title and interest in and to the following assets, properties and rights:

(a)     all cash, bank deposits and cash equivalents of Seller and all bank accounts of Seller, other than the Seller Retained Account;

(b)     all accounts receivable of Seller and all other current assets of Seller of the type reflected on the Interim Balance Sheet (or required to be reflected on the Interim Balance Sheet in accordance with GAAP);

(c)     all inventory, including finished goods, supplies, raw materials, works in progress, spare, replacement and component parts, and other inventory property located at, stored on behalf of or in transit to Seller;

(d)     all deposits, advances, pre-paid expenses and credits;

(e)     all fixed assets, vehicles, equipment, machinery, tools, furnishings, computer hardware and fixtures;

(f)     the Assigned Contracts and the Assigned Leases;

(g)     the Purchased IP;

(h)     the Transferred Permits;

(i)     all causes of action, lawsuits, judgments, claims and demands of any nature, whether arising by way of counterclaim or otherwise;

(j)     all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights;

(k)     all insurance proceeds and insurance awards receivable with respect to any of the Purchased Assets which arise from or relate to events occurring prior to or on the Closing Date; and

(l)     all information, files, correspondence, records, data, plans, reports and recorded knowledge, including customer, supplier, price and mailing lists, maintenance records, and all other records of Seller relating to the Purchased Assets in whatever media retained or stored, including computer programs and disks.

**Section 2.02     Excluded Assets.** Notwithstanding the provisions of Section 2.01, the Purchased Assets shall not include the following assets (collectively, the "**Excluded Assets**"):

(a)     the Seller Retained Account;

(b)     all account and notes receivable due to Seller from a stockholder or Affiliate of

Seller, including 1035 S Charles Street LLC, 701 Pittman Road, LLC, C & R Restaurant Group, LLC, Naylor Property Group, Inc., 2201 Aisquith Street, LLC, 2203-2215 Aisquith Street, LLC, GTN Properties, LLC, Naylor Properties, LLC, Naylor Construction LLC, 25 Thomas Avenue, LLC, and 1015 Curtain Avenue, LLC;

(c) all corporate minute books, stock transfer books, the corporate seal, if any, all accounting records, and all books and records of Seller not related to the Purchased Assets;

(d) all Seller Plans;

(e) all assets set forth on Exhibit 2.02(e);

(f) all policies or agreements for insurance of Seller; and

(g) any rights of Seller created under this Agreement.

**Section 2.03    Assumption of Liabilities.**

(a) Except as provided in Section 2.03(b), Buyer will not assume, in connection with the transactions contemplated hereby, any liability or obligation of Seller whatsoever, whether known or unknown, disclosed or undisclosed, accrued or hereafter arising, absolute or contingent, and Seller will retain responsibility for, and will timely discharge and satisfy, all such liabilities and obligations (collectively, and including the liabilities set forth in Section 2.04, the "**Excluded Liabilities**").

(b) Effective as of the Closing, Buyer will assume and be responsible for the following liabilities and obligations of Seller (collectively, the "**Assumed Liabilities**"):

(i) the obligations of Seller under each Assigned Contract and Assigned Lease, except to the extent such obligations are required to be performed on or prior to the Closing Date, or accrue and relate to the operation of the Business prior to the Closing Date;

(ii) the accounts payable and other current liabilities of Seller of the type reflected or reserved against on the Interim Balance Sheet, except for those listed on Exhibit 2.03(b)(ii); and

(iii) the liabilities listed on Exhibit 2.03(b)(iii).

**Section 2.04    Specifically Excluded Liabilities**.  Specifically, and without in any way limiting the generality of Section 2.03, the Assumed Liabilities do not include, and in no event will Buyer assume, agree to pay, discharge or satisfy any liability or obligation of Seller:

(a) any taxes of Seller for any period, other than those for which there is an accrual reflected on the Interim Balance Sheet;

(b) owed to any stockholder or Affiliate of Seller (other than accrued salary, wages, commissions or bonuses for the then-current payroll period), including 2500 Grays Road LLC, other than the Assigned Leases;

(c) that is being paid off by Buyer at the Closing pursuant to Article III; or

(d)        in respect of any Excluded Asset.

## ARTICLE III
### PURCHASE PRICE; CLOSING

**Section 3.01      Purchase Price.**  The aggregate consideration for the Purchased Assets (the "**Purchase Price**") is:

(a)        the payment by Buyer at the Closing of an amount equal to $750,000 (the "**Initial Purchase Price**"); plus

(b)        the payment by Buyer at the Closing of the aggregate amount of the indebtedness listed on Exhibit 3.01(b) (the "**Aggregate Payoff Amount"**); plus

(c)        the issuance to Seller of the Class C Interests in accordance with Section 3.02(c); plus

(d)        the payment by Buyer of the Deferred Purchase Price in accordance with the terms of Section 3.05; plus

(e)        the assumption by Buyer of the Assumed Liabilities.

**Section 3.02      Payment of Purchase Price**.

(a)        **Payment of Initial Purchase Price and Aggregate Payoff Amount.**  At the Closing, Buyer shall pay (i) to Seller, the Initial Purchase Price to the Seller Retained Account and (ii) to each lender listed on Exhibit 3.01(b), the portion of the Aggregate Payoff Amount listed opposite such lender's name on Exhibit 3.01(b).

(b)        **Deferred Purchase Price**.  Following the Closing, Buyer will pay the Deferred Purchase Price to Seller in accordance with the provisions set forth in Section 3.05.

(c)        **Class C Interests.**  Within 180 days following the Closing, Parent will issue and deliver to Seller the Class C Interests. Simultaneously with the delivery of the Class C Interests, Seller will execute a joinder to the Operating Agreement of Parent, in form and substance reasonably satisfactory to Parent.

**Section 3.03      Closing.**  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") at the offices of Jones Day, 1420 Peachtree St. N.E., Atlanta, GA 30309, or remotely via electronic exchange of documents. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 3.04      Closing Deliverables.**

(a)        At or prior to the Closing (or, in those cases where a specified period of time before the Closing is indicated in this Agreement, by no later than such time), Seller shall deliver to Buyer the following:

(i)        a bill of sale and assumption agreement in form and substance satisfactory to Buyer (the "**Bill of Sale and Assumption Agreement**") and duly executed by Seller,

transferring the Purchased Assets to Buyer and effecting the assignment to and assumption by Buyer of the Assigned Contracts and the Assumed Liabilities;

(ii)    with respect to the Assigned Leases, an Assignment and Assumption of Lease in form and substance satisfactory to Buyer (the "**Assignment and Assumption of Lease**") and duly executed by Seller;

(iii)    copies of all consents, approvals, waivers and authorizations set forth in Section 4.02 of the Disclosure Schedules;

(iv)    a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that Seller is not a foreign person within the meaning of Section 1445 of the Code, duly executed by Seller;

(v)    a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller certifying as to the resolutions of the board of directors of Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(vi)    the Key Employee Agreement, duly executed by Guy Naylor; and

(vii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver the following:

(i)    to Seller, the Initial Purchase Price;

(ii)    to each lender listed on Exhibit 3.01(b), the portion of the Aggregate Payoff Amount listed opposite such lender's name thereon;

(iii)    to Seller, the Bill of Sale and Assumption Agreement duly executed by Buyer;

(iv)    to Seller, the Assignment and Assumption of Lease duly executed by Buyer;

(v)    to Guy Naylor, the Key Employment Agreement, duly executed by Buyer;

(vi)    to Seller, a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying as to the resolutions of the members, managers or board of directors, as applicable, of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby; and

**Section 3.05    Payment of Deferred Purchase Price.**

(a)    **Deferred Purchase Price Payments**.  Subject to Sections 3.05(e) and (f), Buyer shall pay Seller, on an annual basis and in accordance with this Section 3.05, an amount of the Deferred Purchase Price equal to the product of (i) .40 multiplied by (ii) the Adjusted EBITDA for such Calculation Period (the "**Deferred Purchase Price Payment**") up and until Seller has

received Deferred Purchase Price Payments in the aggregate equal to the Deferred Purchase Price; provided, however, that if any Deferred Purchase Price Payment would result in Seller receiving more than the Deferred Purchase Price in the aggregate, then such Deferred Purchase Price Payment shall be reduced by such excess and no further Deferred Purchase Price Payments shall be required under this Agreement.

(b)     **Procedures Applicable to Determination of the Deferred Purchase Price Payments.**

(i)     On or before the date which is 60 Business Days after the last day of each Calculation Period (each such date, a "**Deferred Purchase Price Calculation Delivery Date**"), Buyer shall prepare and deliver to Seller a written statement (in each case, a "**Deferred Purchase Price Calculation Statement**") setting forth in reasonable detail its determination of Adjusted EBITDA for the applicable Calculation Period and its calculation of the resulting Deferred Purchase Price Payment (in each case, a "**Deferred Purchase Price Calculation**").

(ii)     Seller shall have 20 Business Days after receipt of the Deferred Purchase Price Calculation Statement for each Calculation Period (in each case, the "**Review Period**") to review the Deferred Purchase Price Calculation Statement and the Deferred Purchase Price Calculation set forth therein. During the Review Period, Seller and its representatives shall have the right to inspect Buyer's books and records during normal business hours at Buyer's offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of Adjusted EBITDA and the resulting Deferred Purchase Price Payment. Prior to the expiration of the Review Period, Seller may object to the Deferred Purchase Price Calculation set forth in the Deferred Purchase Price Calculation Statement for the applicable Calculation Period by delivering a written notice of objection (a "**Deferred Purchase Price Calculation Objection Notice**") to Buyer; provided, that the only basis on which Seller may dispute any matter in the Deferred Purchase Price Calculation is that a mathematical error was made in calculating the Adjusted EBITDA or the Deferred Purchase Price Payment. Any Deferred Purchase Price Calculation Objection Notice shall specify the items in the applicable Deferred Purchase Price Calculation disputed by Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If Seller fails to deliver a Deferred Purchase Price Calculation Objection Notice to Buyer prior to the expiration of the Review Period, then the Deferred Purchase Price Calculation set forth in the Deferred Purchase Price Calculation Statement shall be final and binding on the parties hereto. If Seller timely delivers a Deferred Purchase Price Calculation Objection Notice, Buyer and Seller shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of the Adjusted EBITDA and the Deferred Purchase Price Payment for the applicable Calculation Period. If Buyer and Seller are unable to reach agreement within 20 Business Days after such a Deferred Purchase Price Calculation Objection Notice has been given, all unresolved disputed items shall be promptly referred to an impartial nationally recognized firm of independent certified public accountants, appointed by mutual agreement of Buyer and Seller (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items with respect to the applicable Deferred Purchase Price Calculation as promptly as practicable, but in no event greater than 20 Business Days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Deferred Purchase Price Calculation Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Buyer and Seller shall each furnish to the Independent Accountant such work

papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by Buyer and Seller, and not by independent review. The resolution of the dispute and the calculation of Adjusted EBITDA that is the subject of the applicable Deferred Purchase Price Calculation Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by Seller and Buyer in proportion to the amounts by which their respective calculations of Adjusted EBITDA differ from Adjusted EBITDA as finally determined by the Independent Accountant.

(c)  **Timing of Payment of Deferred Purchase Price Payments.** Subject to Sections 3.05 (e) and (f), Buyer shall pay in full each Deferred Purchase Price Payment no later than 30 Business Days following the date upon which the determination of Adjusted EBITDA for the applicable Calculation Period becomes final and binding upon the parties as provided in Section 3.05(b)(ii) (including any final resolution of any dispute raised by Seller in a Deferred Purchase Price Calculation Objection Notice). Buyer shall pay to Seller the applicable Deferred Purchase Price Payment in cash by wire transfer of immediately available funds to the Seller Retained Account or such other account as Seller may designate pursuant to Section 3.07.

(d)  **Post-Closing Operation of the Business.** Subject to the terms of this Agreement, following the Closing, Buyer shall have sole discretion with regard to all matters relating to the operation of the Business. Buyer has no obligation to operate the Business in order to achieve any Deferred Purchase Price Payment or to maximize the amount of any Deferred Purchase Price Payment.

(e)  **Right of Set-off.** Buyer shall have the right to withhold and set off against any amount otherwise due to be paid pursuant to this Section 3.05 the amount of any losses to which Buyer may be entitled under Article VII of this Agreement.

(f)  **Set-Off Against Prior Loan**.  Seller acknowledges that Buyer has loaned to Seller $175,000 (the "**Prior Loan**") and, as of the date hereof, the outstanding principal amount of the Prior Loan is $175,000. Buyer will be entitled to deduct and withhold up to 50% of each Deferred Purchase Price Payment, until the principal amount of the Prior Loan is repaid in full. If at the time of any Deferred Purchase Price Payment, the outstanding principal amount of the Prior Loan is less than 50% of the Deferred Purchase Price Payment due for such Calculation Period, Buyer will only be entitled to withhold an amount equal to the outstanding principal amount of the Prior Loan. Nothing herein will (i) prevent Seller from making repayments of the Prior Loan in addition to the withholding contemplated by this Section 3.05(f) or (ii) limit Seller's obligation to repay the Prior Loan in full prior to the date on which Buyer has paid the entirety of the Deferred Purchase Price to Seller.

(g)  **No Security.** The parties hereto understand and agree that (i) the rights to receive the Deferred Purchase Price Payments shall not be represented by any form of certificate or other instrument, are not transferable, except by operation of laws relating to descent and distribution, divorce and community property, and do not constitute an equity or ownership interest in Buyer, (ii) Seller shall not have any rights as a securityholder of Buyer as a result of Seller's right to receive any Deferred Purchase Price Payment hereunder, and (iii) no interest is payable with

respect to any Deferred Purchase Price Payment.

**Section 3.06    Allocation of Purchase Price.**  Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with <u>Exhibit 3.06</u>. Buyer and Seller shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

**Section 3.07    Method of Payment**.  All payments required under this <u>Article III</u> or any other provision of this Agreement will be made in cash by wire transfer of immediately available federal funds to the Seller Retained Account or such other bank account designated in writing by Seller.

**Section 3.08    Withholding Tax.**  Buyer shall be entitled to deduct and withhold from the Purchase Price all taxes that Buyer may be required to deduct and withhold under any applicable tax law, which have been identified and agreed to by Seller prior to the Closing. All such withheld amounts shall be treated as delivered to Seller hereunder; <u>provided</u>, <u>however</u>, that such amount withheld pursuant to applicable tax laws are actually remitted to the appropriate Governmental Authority as and when required by law.


# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

For purposes of this <u>Article IV</u>, "Seller's knowledge," "knowledge of Seller" and any similar phrases shall mean the actual or constructive knowledge of any member, manager, director or officer of Seller, after due inquiry. Except as set forth in the disclosure schedules delivered by Seller in connection with this Agreement (the "**Disclosure Schedules**"), Seller represents and warrants to Buyer as follows:

**Section 4.01    Organization and Authority of Seller; Enforceability.**  Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of Maryland. Seller has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

**Section 4.02    No Conflicts; Consents.**  The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or

default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. Except as set forth in Section 4.02 of the Disclosure Schedules, no consent, approval, waiver or authorization is required to be obtained by Seller from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

Section 4.03     **Title to and Sufficiency of Purchased Assets.**  Except as set forth in Section 4.03 of the Disclosure Schedules, Seller owns and has good title to the Purchased Assets, free and clear of Encumbrances. The Purchased Assets constitute all of the assets required to operate the Business as currently conducted, and are sufficient for the continued conduct of the Business immediately after the Closing in substantially the manner conducted prior to the Closing.  Section 4.03 of the Disclosure Schedules sets forth a description of all material services received by the Business provided by individuals who are not Business Employees or provided using assets that are not included in the Purchased Assets, including any such services provided by a stockholder of Seller or any Affiliate of such stockholder (other than Seller) who is not a Business Employee.

Section 4.04     **Financial Statements**.  Section 4.04(a) of the Disclosure Schedules contains (i) the Interim Balance Sheet and related statements of income and cash flows of Seller as of and for the three-month period ended on the Interim Balance Sheet Date, (ii) the audited balance sheets and related statements of income and cash flows of Seller as of and for the years 2014 and 2015, respectively, and (iii) the unaudited balance sheet and related statements of income and cash flows of Seller as of and for the year 2016. All such balance sheets and statements of income and cash flows have been prepared in conformity with GAAP consistently applied and present fairly in all material respects the financial position, results of operations and cash flows of Seller as of their respective dates and for the respective periods covered thereby. Except as set forth in Section 4.04(b) of the Disclosure Schedules, Seller is not, with respect to the Business, subject to any known or asserted liability which is not shown or which is in excess of amounts shown or reserved for in the Interim Balance Sheet, other than liabilities of the same nature as those set forth in the Interim Balance Sheet and incurred in the ordinary course of business after the Interim Balance Sheet Date.

Section 4.05     **Operations since Interim Balance Sheet Date**.  Except as set forth in Section 4.05 of the Disclosure Schedules, and except for the transactions contemplated by this Agreement, since the Interim Balance Sheet Date (a) there has been no material adverse change in the Purchased Assets, the Business or the operations, liabilities, profits or condition (financial or otherwise) of Seller, and, to the knowledge of Seller, no fact or condition exists or is contemplated or threatened which would reasonably be expected to cause such a change in the future, and (b) Seller has conducted the Business only in the ordinary course and in conformity with past practice.

Section 4.06     **Condition of Assets.**  The tangible personal property included in the Purchased Assets is in good condition and is adequate for the uses to which it is being put, and none of such tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

**Section 4.07    Inventory.**  All inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories included in the Purchased Assets consist of a quality and quantity usable and salable in the ordinary course of business.

**Section 4.08    Intellectual Property.**

(a)    Section 4.08(a) of the Disclosure Schedules lists all Intellectual Property included in the Purchased Assets ("**Purchased IP**"). Seller owns or has adequate, valid and enforceable rights to use all the Purchased IP, free and clear of all Encumbrances. Seller is not bound by any outstanding judgment, injunction, order or decree restricting the use of the Purchased IP, or restricting the licensing thereof to any Person. With respect to the registered Intellectual Property listed on Section 4.08(a) of the Disclosure Schedules, (i) all such Intellectual Property is valid, subsisting and in full force and effect and (ii) Seller has paid all maintenance fees and made all filings required to maintain Seller's ownership thereof. For all such registered Intellectual Property, Section 4.08(a) of the Disclosure Schedules lists (A) the jurisdiction where the application or registration is located, (B) the application or registration number, and (C) the application or registration date.

(b)    Seller's prior and current use of the Purchased IP has not and does not infringe, violate, dilute or misappropriate the Intellectual Property of any Person and there are no claims pending or, to Seller's knowledge, threatened by any Person with respect to the ownership, validity, enforceability, effectiveness or use of the Purchased IP. No Person is infringing, misappropriating, diluting or otherwise violating any of the Purchased IP, and neither Seller nor any Affiliate of Seller has made or asserted any claim, demand or notice against any Person alleging any such infringement, misappropriation, dilution or other violation.

**Section 4.09    Assigned Contracts.**  Section 4.09 of the Disclosure Schedules lists each contract included in the Purchased Assets and being assigned to and assumed by Buyer (the "**Assigned Contracts**"). Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect, or is a month-to month contract under which goods or services are being provided after the expiration of its original term. None of Seller or, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. Other than the transactions contemplated by this Agreement, no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder. Complete and correct copies of each Assigned Contract have been made available to Buyer. There are no disputes pending or threatened under any Assigned Contract.

**Section 4.10    Permits.**  Section 4.10 of the Disclosure Schedules lists all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained from governmental authorities included in the Purchased Assets (the "**Transferred Permits**"). The Transferred Permits are valid and in full force and effect. All fees and charges with respect to such Transferred Permits as of the date hereof have been paid in full. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Transferred Permit.

**Section 4.11    Environmental Matters.**  Except as set forth in Section 4.11 of the

Disclosure Schedules:  (i) Seller complies, and for the last five years has complied, in all material respects with all applicable Environmental Laws; (ii)  Seller has obtained all Environmental Permits necessary for the operation of the Business, all such Environmental Permits are in good standing, and Seller is, and has for the past five years been, in compliance in all material respects with all of the terms and conditions thereof, and the transactions contemplated by this Agreement will not result in or trigger the termination, revocation, or right of termination or cancellation, of any such Environmental Permits; (iii) there are not now, nor in the last five years has there been, any lawsuits, claims, proceedings or investigations concerning Environmental Laws pending or, to the knowledge of Seller, threatened against or affecting Seller or the Purchased Assets nor, to the knowledge of Seller, is there currently any reasonable basis for any of the same; and (iv) Seller has not received any notice that it is or may be subject to any liability with respect any actual or alleged presence of, or exposure to, Hazardous Substances or violation of Environmental Law at any location.

Section 4.12    Non-foreign Status.  Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

Section 4.13    Compliance With Laws.  Seller has complied, and is now complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Purchased Assets.

Section 4.14    Legal Proceedings.  Except as set forth in Section 4.14 of the Disclosure Schedules,  there is no claim, action, suit, proceeding or governmental investigation ("Action") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. Except as set forth in Section 4.14 of the Disclosure Schedules, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

Section 4.15    Real Property.  Seller does not now own any real property or hold any option to acquire any real property. Section 4.15 of the Disclosure Schedules sets forth (i) a list of each lease or similar agreement under which Seller is lessee of, or holds or operates, any real property owned by any third Person and that is being assigned to Buyer in connection with the transactions contemplated by this Agreement ("Assigned Leases"), and (ii) a list and brief description of all material leasehold improvements made to the properties leased pursuant to the Assigned Leases. Each Assigned Lease is valid and binding on Seller in accordance with its terms and is in full force and effect. None of Seller or, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Lease. Other than the transactions contemplated by this Agreement, no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assigned Lease or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder. Complete and correct copies of each Assigned Lease have been made available to Buyer. There are no disputes pending or threatened under any Assigned Lease.

Section 4.16    Employees and Employment Matters.

(a)    Section 4.16(a)(i) of the Disclosure Schedules sets forth a list of each Business

Employee and the name, title, date of birth, and date of hire of each such person. Section 4.16(a)(ii) of the Disclosure Schedules sets forth a list of each material Seller Plan. Seller is, and has been, in compliance in all material respects with all applicable laws in respect of the Business Employees and the Seller Plans, including under ERISA and the Code. Seller is not party to any collective bargaining agreement and is not, and has not previously been, the subject of any collective bargaining or union organizing activity. Except as set forth in Section 4.16(a)(iii) of the Disclosure Schedules, Seller is not a party to any employment agreement, or any other agreement, providing for any payment or consideration payable to any Business Employee upon a change of control or a sale of all or any portion of the Business.

(b)     Each Seller Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS that it is so qualified, and each related trust that is intended to be exempt from federal income tax pursuant to Section 501(a) of the Code has received a determination letter from the IRS that it is so exempt, and no fact or event has occurred or is expected to occur since the date of such determination letter that could reasonably be expected to adversely affect such qualification or exemption, as the case may be.

(c)     Seller has not incurred any liability, contingent or otherwise, under or arising out of Title IV of ERISA that has not been satisfied in full and no fact or event exists that has or could reasonably be expected to result in such a liability. None of the Purchased Assets is the subject of any Encumbrance arising with respect to any Seller Plan under applicable law (including ERISA and the Code).

(d)     Seller is in compliance in all material respects with all laws relating to the employment of the Business Employees, and has paid in full all wages, salaries, commissions, and other compensation and benefits, as well as all contributions due to them or to third parties on their behalf (including taxes, social security taxes, workers compensation contributions and employment insurance payments). No material claim, charge or litigation with respect to such compliance or payment obligations has been asserted, is now pending, or to the knowledge of Seller, has been threatened with respect to current or former Business Employees. There are no outstanding, unsatisfied obligations to comply with any recommendations or declarations of any Governmental Authority in respect of claims by current or former Business Employees.

**Section 4.17     Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 4.18     Full Disclosure.**  No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

For purposes of this Article V, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual or constructive knowledge of any member, manager, director or officer of Buyer, after due inquiry. Buyer represents and warrants to Seller as follows:

**Section 5.01     Organization and Authority of Buyer; Enforceability.**  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware. Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 5.02     No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 5.03     Financial Statements.**  Exhibit 5.03 sets forth a true and correct copy of Parent's good-faith estimate of Parent's pro-forma consolidated income statement for fiscal years 2017-2020. Such estimate is not a guarantee of financial results, nor is it intended to be an inducement for Seller to enter into this Agreement.

**Section 5.04     Legal Proceedings.**  There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer or Parent that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 5.05     Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

## ARTICLE VI
### COVENANTS

**Section 6.01     Public Announcements.**  Unless otherwise required by applicable law, neither party shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed).

**Section 6.02     Employee Matters**. Buyer may, in its sole and absolute discretion, make an offer of employment to any Business Employee. Seller hereby waives any contractual or other obligation or provision that would restrict any Business Employee from accepting employment with Buyer or would otherwise restrict the activities of any Business Employee hired by Buyer, including any non-competition or non-solicitation covenant contained in an agreement between Seller and any Business Employee. Seller will use commercially reasonable efforts to cause each Business Employee to whom Buyer makes an offer of employment to accept such offer in a timely manner.

**Section 6.03     Covenant Not to Compete and Confidentiality**

(a)     In furtherance of the sale of the Business and the Purchased Assets and to more effectively protect the value and goodwill thereof, Seller covenants and agrees for a period ending on the five-year anniversary of the Closing Date (the "**Restricted Period**"), that it will not, directly or indirectly (whether as principal, agent, independent contractor, employee, partner or otherwise), own, manage, operate, control, participate in, perform services for, or otherwise carry on, a business competitive with the Business (a "**Competing Business**") anywhere in the United States (it being understood by the parties hereto that the Business is not limited to any particular region of the United States and that such Business may be engaged in effectively from any location in the United States).

(b)     Seller will hold in confidence at all times following the Closing all Confidential Information and will not disclose, publish or make use of Confidential Information at any time following the date hereof without the prior written consent of Buyer.

(c)     It is the intent and understanding of each party hereto that if, in any action before any Governmental Authority legally empowered to enforce this Section 6.03, any term, restriction, covenant or promise in this Section 6.03 is found to be unreasonable and for that reason unenforceable, then such term, restriction, covenant or promise shall be deemed modified to the extent necessary to make it enforceable by such Governmental Authority.

(d)     In the event that Seller violates any obligation under this Section 6.03, Buyer may proceed against Seller in law or in equity.  Seller acknowledges that a violation of this Section 6.03 would cause Buyer irreparable harm which cannot be adequately compensated for by money damages.  Seller expressly acknowledges that the remedy at law for any breach of this Section 6.03 will be inadequate, and that upon any such breach or threatened breach Buyer shall be entitled as a matter of right to injunctive relief in any court or other tribunal of competent jurisdiction, in equity or otherwise, and to enforce the specific performance of the obligations under these provisions without the necessity of proving actual damages or the inadequacy of a legal remedy or posting a bond or other security.  If Buyer prevails in any action commenced under this Section 6.03, it will also be entitled to recover its expenses in connection therewith.

**Section 6.04     Bulk Sales Laws.**  The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Section 6.05     Transfer Taxes.**  All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be

borne and paid fifty percent (50%) by Buyer and Seller when due. Buyer and Seller shall cooperate in timely paying and filing any tax return or other document with respect to such taxes or fees.

Section 6.06    **Further Assurances.**  Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

Section 6.07    **Consents**.  Until such time as each Non-Assignable Contract can be assigned to Buyer, and then during the remaining term of each Non-Assignable Contract, Seller will make the benefit of such Non-Assignable Contract available to Buyer so long as Buyer fully cooperates with Seller and reimburses Seller for all payments made by Seller in connection therewith.  In addition, during the remaining term of each Non-Assignable Contract, Seller will use commercially reasonable efforts to (a) obtain the consent of the third parties required thereunder, and (b) enforce, at the request of Buyer and for the account of Buyer, any right of Seller arising from such Non-Assignable Contract against the other party or parties thereto (including the right to elect or terminate any such Non- Assignable Contract in accordance with the terms thereof). Seller will not take any action or suffer any omission that would reasonably be expected to limit, restrict or terminate in any material respect the benefits to Buyer of such Non-Assignable Contract unless, in good faith and after consultation with and prior written notice to Buyer, Seller is (i) ordered to do so by a Governmental Authority of competent jurisdiction or (ii) otherwise required to do so by law; provided, however, that if any such order is appealable and Buyer so requests, Seller will take such reasonable actions as are requested by Buyer to file and pursue such appeal and to obtain a stay of such order, and the Seller shall reimburse Buyer for the costs incurred by Buyer related to the appeal of such an order. Nothing in this Agreement or the Bill of Sale and Assumption Agreement constitutes a sale, assignment, transfer or conveyance to, or assumption by, Buyer of the Non-Assignable Contracts. With respect to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to Buyer is obtained following the Closing, Seller will transfer such Non-Assignable Contract to Buyer by execution and delivery of an instrument of conveyance reasonably satisfactory to Buyer within five business days following receipt of such approval or consent.

Section 6.08    **Non-Consenting Creditors**.  The parties acknowledge and agree that Seller's liabilities to Wells Fargo Bank N.A., BMO Harris Bank, N.A. and Hale Trailer Brake & Wheel, Inc. (the "**Non-Consenting Creditors**") are Excluded Liabilities (the "**Non-Consenting Creditor Liabilities**"), and Seller's assets subject to or securing such Non-Consenting Creditor Liabilities, which are specifically identified on Exhibit 2.02(e), are Excluded Assets (the "**Non-Consenting Creditor Assets**"). Following the Closing, the parties will reasonably cooperate with one another in attempting to obtain the consent of, or enter into arrangements with, the Objecting Creditors, such that Purchaser will be permitted to (i) purchase the Non-Consenting Creditor Assets from Seller and (ii) assume the Non-Consenting Creditor Liabilities. At such time as the consent of a Non-Consenting Creditor has been obtained or Purchaser has entered into an arrangement with a Non-Consenting Creditor, in either case such that clauses (i) and (ii) of the previous sentence are satisfied, the parties will execute reasonable documentation to

evidence Purchaser's purchase of the Non-Consenting Creditor Assets and assumption of the Non-Consenting Creditor Liabilities. For the avoidance of doubt, in the event that Buyer assumes or pays off a Non-Consenting Creditor Liability, Buyer will assume the associated Non-Consenting Creditor Assets without the payment of additional consideration in respect of such Non-Consenting Creditor Assets.

## ARTICLE VII
### INDEMNIFICATION

**Section 7.01      Survival.**  All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing and continue in full force and effect for four years thereafter, except (i) the representations and warranties set forth in Sections 4.11 and 4.16, which shall survive the Closing and continue in full force and effect until the applicable statute of limitations expires (or for 15 years if there is no applicable statute of limitations) and (ii) the representations and warranties set forth in Section 4.01 and 5.01, which shall survive the Closing and will continue in full force and effect forever.

**Section 7.02      Indemnification By Seller.**  Subject to the other terms and conditions of this Article VII, Seller shall defend, indemnify and hold harmless Buyer, its Affiliates and their respective members, managers, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a)      any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder;

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any document to be delivered hereunder;

(c)      the operation and ownership of, or conditions first occurring with respect to the Purchased Assets prior to 12:01 a.m. on the Closing Date (other than the Assumed Liabilities relating thereto); or

(d)      any Excluded Asset or Excluded Liability.

**Section 7.03      Indemnification By Buyer.**  Subject to the other terms and conditions of this Article VII, Buyer shall defend, indemnify and hold harmless Seller, its Affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a)      any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder;

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder; or

(c)      except as contemplated by Section 7.02(c), any Purchased Asset and any Assumed Liability.

**Section 7.04     Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 7.05     Tax Treatment of Indemnification Payments.** All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

**Section 7.06     Effect of Investigation.** Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

**Section 7.07     Cumulative Remedies.** The rights and remedies provided in this <u>Article VII</u> are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

## ARTICLE VIII
### MISCELLANEOUS

**Section 8.01     Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 8.02     Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective

parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

| | |
|---|---|
| If to Seller: | Nova Services, Inc.<br>Guy T Naylor<br>5715 Roland Avenue<br>Baltimore MD 21210<br>Email: gtnayls@yahoo.com |
| with a copy to: | Tandem Legal Group<br>829 7th Street NW<br>Washington, DC 20001<br>Attention: Julia V. Taylor<br>Email: julia@tndm.com |
| If to Buyer: | Recleim Nova, LLC<br>c/o Peachtree Investment Solutions, LLC<br>34 Old Ivy Road, Suite 200<br>Atlanta, GA 30342<br>Attention: Pete Davis<br>E-mail: pete@peachtreeinv.com |
| with a copy to: | Jones Day<br>1420 Peachtree St., N.E., Suite 800<br>Atlanta, GA 30309<br>Attention: Ken Boehner<br>E-mail: kboehner@jonesday.com |

**Section 8.03    Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 8.04    Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 8.05    Entire Agreement.**  This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 8.06    Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted

assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Buyer may assign this Agreement to an Affiliate of Buyer without the prior consent of Seller. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.07    No Third-party Beneficiaries.**  Except as provided in <u>Article VII</u>, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 8.08    Amendment and Modification.**  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 8.09    Waiver.**  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 8.10    Governing Law.**  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

**Section 8.11    Submission to Jurisdiction.**  Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware in each case located in the city of Wilmington and county of New Castle, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

**Section 8.12    Waiver of Jury Trial.**  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 8.13    Specific Performance.**  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 8.14    Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means

of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER:**

NOVA SERVICES, INC.

By_____
Name: Guy Naylor
Title: President

**BUYER:**

RECLEIM NOVA, LLC

By_____
Name:
Title:

**PARENT:**

RECLEIM LLC

By_____
Name:
Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

SELLER:

NOVA SERVICES, INC.

By_____
Name: Guy Naylor
Title: President

BUYER:

RECLEIM NOVA, LLC

By_____
Name: Steve Bush
Title: Manager

PARENT:

RECLEIM LLC

By_____
Name: Pete Davis
Title: Principal